## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**NIKKI PILVELIS,**

**Plaintiff,**

**-vs-**                                                       **Case No.  6:06-cv-358-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

### ORDER

This cause came on for consideration without oral argument on the Complaint filed by Nikki Pilvelis seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 6.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 9, 10.

### I.      PROCEDURAL  HISTORY.

In May 2002, Pilvelis applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*., (sometimes referred to herein as the Act).  R. 74-76, 525-28.  The applications alleged that Pilvelis became disabled on August 18, 1999.  *Id*.  She later amended her alleged onset date to April 6,

2001.  R. 580.  Pilvelis's applications were denied initially and on reconsideration. R. 28-30, 32-34, 530-32, 534-37.

Pilvelis made a timely request for a hearing before an administrative law judge (ALJ).  R. 38.  An ALJ held a hearing on June 9, 2005.  Pilvelis, represented by an attorney, testified at the hearing.  Robert Bradley, a vocational expert (VE), also testified.  R. 538-82.

After considering the testimony and the medical evidence presented, the ALJ determined that Pilvelis was insured under OASDI through the date of decision.  R. 24. The ALJ found that Pilvelis had not engaged in substantial gainful activity since her amended alleged onset date.  R. 19, 25.

The ALJ concluded that the medical evidence showed that Pilvelis had chronic right knee pain due to multiple knee surgeries, which was a severe impairment.  This impairment did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  R. 21.  The ALJ also found that Pilvelis had carpal tunnel syndrome, depression/adjustment disorder, and history of Crohn's disease, which were non-severe.  R. 21, 24.  The ALJ based this determination on medical evidence showing only mild carpal tunnel syndrome, lack of treatment for Crohn's disease, and statements by treating and examining physicians regarding her mental condition.  *Id.*

The ALJ found that Pilvelis had the residual functional capacity (RFC) "to lift 10 pounds occasionally and less than 10 pounds frequently, sit for up to 6 hours in an 8-hour workday with a

---

[1]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

maximum of 1 hour at a time," and occasionally balance, stoop and push or pull with the lower right extremity.  She was restricted from work that required any climbing, kneeling, crawling, or crouching.  Additionally, she "require[d] 1 or 2 breaks per workday lasting for 5 to 10 minutes." R. 23.

In reaching this conclusion, the ALJ gave significant weight to the opinion of Dr. Gerber because he was the only physician in the record who had treated Pilvelis over a reasonable period of time, and because his opinion was consistent with the record as a whole.  R. 24.  The ALJ gave little weight to the opinion of Dr. Kirkpatrick that Pilvelis was not capable of full-time work, and no weight to the opinion of Dr. Smith, finding that the record did not support the functional limitations indicated by these physicians.  R. 23-24.  The ALJ also found that Pilvelis's testimony about the limitations arising from carpal tunnel syndrome and depression was not fully credible because objective medical evidence showed only mild carpal tunnel syndrome and because she had not sought treatment regarding her depression.  R. 24.

Relying on the testimony of the VE and the *Dictionary of Occupational Title*, the ALJ concluded that Pilvelis could return to her past relevant work as a dispatcher, both as performed and as it is generally performed in the economy.  *Id*.  Therefore, the ALJ concluded that Pilvelis was not disabled.  R. 25.

Pilvelis requested review of the ALJ's decision. R. 9-14.  She also submitted a statement from Dr. Gerber recommending that Pilvelis be evaluated by a psychiatrist.  R. 15.  On February 10, 2006, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.  Pilvelis timely sought review by this Court.  Doc. No. 1.

II.     **JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Pilvelis's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir.

1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42

U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

III.    **STATEMENT OF FACTS.**

*A.      Evidence from Pilvelis.*

Pilvelis was born July 16, 1970.  R. 545.  She is 5'0" tall and weighed 139 pounds.  R. 101.

She completed high school but no college or vocational training.  R. 546.  She lived with her

boyfriend and son, who was nine years old at the time of the hearing.  R. 544.   At the time of the

hearing, she did not have any private health insurance.  R. 554.

Pilvelis had previously worked in retail, including jewelry stores.  R. 103, 546.  She had

also worked as an emergency dispatcher for AAA.  R. 103, 547.  As a dispatcher, she was required

to sit unless on a break.  R. 113, 563.  She occasionally had to crouch and handle big objects, and

wrote, typed or handled small objects throughout the day.  R. 103.  She did not believe she could

perform that job because of difficulty sitting, concentrating, and remembering.  R. 563.  She had

also briefly worked as a bank teller, and as a cashier at an amusement park and at a convenience

store.  R. 547-49.

Pilvelis injured her knee in 1999, and underwent multiple surgeries.  R. 550.  During one

surgery in April 2001, the surgeon "nipped an artery" and she experienced internal bleeding.  R.

551.  Thereafter, she experienced constant leg pain and lower back pain.  R. 119, 554, 558.  She

took medication, had received epidural injections, and used a TENS unit to relieve the pain.  R. 120, 555, 558-59.

She had a knee impairment that had been diagnosed as reflex sympathetic dystrophy (RSD)[2].  R. 555.  The pain associated with this condition prevented her from concentrating.  R. 556.  She had seen Dr. Kirkpatrick for this condition approximately five times.  R. 559.

She experienced depression after her knee surgery, for which she took Lexapro.[3]  R. 123, 563.  She reported that she had trouble concentrating and difficulty remembering.  R. 134-35.  However, her father indicated in June 2002 that he had not observed that Pilvelis had memory or concentration problems.  R. 131.

She had also been diagnosed with Crohn's disease,[4] which lead to ulcers, nausea and diarrhea.  R. 556.  It was controlled with medication.  R. 122.  In July 2004, she had her gallbladder removed.  R. 557.

---

[2]  "Complex regional pain syndrome (CRPS) is a chronic pain syndrome with two forms. CRPS 1 currently replaces the term 'reflex sympathetic dystrophy syndrome.' It is a chronic nerve disorder that occurs most often in the arms or legs after a minor or major injury. [It] is associated with severe pain; changes in the nails, bone, and skin; and an increased sensitivity to touch in the affected limb."  Medline Plus, *Complex regional pain syndrome*, http://www.nlm.nih.gov/medlineplus/ ency/article/007184.htm (last visited Mar. 19, 2007).

[3]  Lexapro is the brand name for escitalopram and is used to treat depression and generalized anxiety disorder. Medline Plus, *Escitalopram*, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a603005.html (last visited Mar. 19, 2007).

[4]  Crohn's disease, also known as regional enteritis, is a chronic enteritis, or inflammation of the intestine, of unknown cause that is "characterized by patchy deep ulcers . . . [and] narrowing and thickening of the bowels;" "symptoms include fever, diarrhea, cramping abdominal pain, and weight loss."  STEDMAN'S MEDICAL DICTIONARY 495, 575 (26th ed. 1996) (hereinafter STEDMAN'S).

She developed carpal tunnel syndrome in 2004.  R. 557.  She had difficulty holding things, and her hands swelled.  *Id*.  She estimated she could lift no more than ten pounds because of wrist pain.  R. 564.

In an average day, Pilvelis was able to sit for about an hour, and then she would need to take medicine and lie down.  R. 553.  After two or three hours, she could sit again.  *Id*.  However, lying down also hurt because she was unable to make her leg comfortable.  R. 555.  A doctor had prescribed a wheelchair, but she had not been able to obtain one.  R. 554.  She estimated that she could stand for up to fifteen minutes without pain in the right leg and lower back.  *Id*.  Sometimes she required assistance showering because of pain while standing.  R. 120, 128.

She had difficulty walking and estimated she could not walk even a block.  R. 119, 558.  She also had trouble climbing steps.  R. 561.  She could bend, but would have trouble with repeated bending.  R. 119, 564.  She could not squat.  R. 564.  She also experienced problems balancing.  *Id*.  She stopped going to physical therapy because it caused too much pain.  R. 567.

She often got in bed around 5:00 P.M.  R. 560.  However, she did not usually fall asleep until around 1:00 in the morning, and had difficulty sleeping more than about two hours because of pain.  R. 562.  She rarely got more than two or three hours of sleep per day.  *Id*.  She took medication for help sleeping.  *Id*.  Trouble sleeping caused trouble concentrating during the day.  *Id*.

Pilvelis drove her son to school, which was about two miles from her home.  R. 553.  She had trouble driving, but estimated she could drive thirty miles with breaks.  *Id*.  She could go grocery shopping, but usually took someone with her or sent her son to pick up the groceries.  R.

-6-

120, 559.  She could do laundry and other household chores but required assistance from her

boyfriend or son.  R. 120, 560.  She could cook, but she prepared meals with short preparation

time because of difficulty standing.  *Id*.  She tried to vacuum, but had to sit down and rest

frequently due to pain and fatigue.  R. 131, 560.  During a typical day, she would have to lie down

or recline as the day went on.  R. 560.

She did not attend church or participate in social groups, but had done so before her

injuries.  R. 121, 133, 561.  Her parents visited approximately once per week, but otherwise she

did not have visitors.  R. 561; *see also* R. 131 (SSA interview with Pilvelis's father).  She read,

watched television, and went to movies with her son.  R. 568.  She could not do crafts because of

carpal tunnel syndrome.  *Id*.

> B.   *Vocational Expert Testimony.*

The VE described Pilvelis's past relevant work as follows: Dispatcher, Dictionary of

Occupational Titles (DOT) Number 249.167-014, which is sedentary work with a skill level of 5;

Cashier, DOT 211.462-014, which is semi-skilled light work under the DOT, but medium work as

performed, with a skill level of 3; and bank-teller, DOT 211.362-018, which is semi-skilled light

work with a skill level of 5.[5]  R. 138, 571-72.

---

[5]   The DOT categorizes jobs according to specific vocational preparation (SVP), which addresses the period of time necessary to learn the job.  Another element of each DOT description, the reasoning requirement, addresses the need to exercise judgment and the complexity of the tasks to be performed.  Westlaw DICOT Appendix C - Components of the Definition Trailer.

The ALJ posed the following hypothetical question to the VE:

> [A]ssume an individual who is 34 years of age with a high-school
> education and prior work experience that has been described . . . .
> [A]ssume that the individual is limited to sedentary work activity . . .
> [and] would be limited to a maximum time in a seated position at
> one time of one hour.  In other words, that would be the maximum
> time seated before the opportunity to stand up.  And also that the
> individual would be restricted in terms of postural activities to the
> extent that balancing, stooping, would be occasional and activities
> such as climbing, kneeling, crawling and crouching should be less
> than occasional to none . . . .  How would those restrictions impact
> the prior work experience?

R. 572-73.  Based on this hypothetical question, the VE opined that the hypothetical claimant

could return to the job of dispatcher "[a]s long as you're allowed to sit for up to an hour and maybe

you could stand up just a minute or two to stretch your legs.  You couldn't leave the workstation."

R. 573.  The VE testified that altering the hypothetical to permit standing up to five to ten minutes

every one to two hours would not affect his opinion.  *Id*.  Further, one to two breaks per day of five

to ten minutes would be consistent with a normal work schedule.  *Id*.  The VE further opined that a

restriction against pushing or pulling with one of the lower extremities would not impact his

opinion.  R. 573-74.  However, the VE opined that a requirement that the claimant lie down for at

least one-half hour each day would preclude all work.  R. 575.

Pilvelis's attorney asked the VE to opine about the effect frequent absences from work

would have on Pilvelis's ability to work.  The testimony was as follows:

> Q. (by attorney)          And what would be the impact if an
> individual would potentially be absent three to four days a month
> from the work place?
>
> A.          That would preclude the work.

> Q.      Would that be the same for two to three days a month?
>
> A.      Two to three days a month, your job would be in serious jeopardy.  The first, I think you said three to four? . . . Three to four, I would say you'd be terminated, but two to three on a consistent basis – on a monthly basis, . . . your job would be in serious, serious jeopardy.
>
> Q.      So it might be tolerated on a – once in a while.
>
> A.      Maybe once a quarter –
>
> Q.      But not on a regular basis?
>
> A.      Not on a regular basis, no. . . .
>
> Q. (by ALJ)    The last question was three to four probably be terminated, two to three serious jeopardy.  Let's split to maybe three times a month, how would you characterize that?
>
> A.      I'd say you would still be, you'd be in serious jeopardy.  If it was three days a month consistently on a monthly basis, I'd say that would preclude work.

R. 574-75.

Finally, the VE opined that adding a limitation against frequent or constant fine motor coordination and picking up small objects would preclude the cashier position.  R. 575-77.  It would also impact the dispatcher position, which requires frequent coordination and manipulation of small objects.  R. 578.  An inability to finger or handle six hours in an eight-hour day would preclude the dispatcher position.  R. 579.

    *C.*   *Medical Records.*

    1.   <u>Records Regarding Physical Impairments</u>.

Records from the Florida Hospital Centra Care walk-in facility indicate that Pilvelis was seen in June 1996 for arm pain after hitting her right forearm on a table at work.  R. 283-84.  She

was released for normal duty work and advised to use a splint.  R. 282, 284.  She also hit her right

arm on her desk in September 1998.  R. 281.  Her grip strength was reduced and she was directed

to continue using a splint.  R. 280.

In January 1999, Pilvelis was seen by Brent D. Schlapper, D.O., for headaches.  R. 376-77,

383-86.  The assessment included sinusitis and other conditions for which the records are illegible.

R. 384; *see also* R. 370-72 (records from February 1999); R. 368 (records from April 1999).  Dr.

Schlapper referred Pilvelis to Bhupinder S. Mangat, M.D., for further evaluation.  Pilvelis reported

having diffuse headaches with steady, severe pain and occasional nausea.  R. 266.  Dr. Mangat's

impression was that Pilvelis suffered from chronic muscle tension headaches for which he

prescribed medication.  R. 268.

In March 1999, Pilvelis underwent a colonoscopy.  R. 292-308 (surgical records).  Nitin J.

Parikh, M.D., observed no evidence of active Crohn's disease, but did observe signs of irritable

bowel syndrome.  R. 301; *see also* R. 366 (record of May 1999).  In April, Dr. Parikh prescribed

stomach medicine and recommended a referral to a psychologist for stress management.  R. 269.

In June 1999, Pilvelis was seen at the emergency room for depression and a headache that

lasted over two days.  R. 270-73.  The attending physician noted that she had a history of

depression and had been prescribed Zoloft, an antidepressant.  R. 270.  The diagnosis was

situational depression "on top of already existing depressional situation," and migraine headache.

R. 271; *see also* R. 380-82 (headaches in November 1999 and February 2000).  Also in June 1999,

she was seen by Dr. Schlapper for headache, back pain and difficulty sleeping.  R. 363.

In August 1999, she fell at work and injured her right knee.  R. 277, 291; *see* R. 359 (imaging record from August 1999).  John F. Schaeffer, M.D., restricted her from any work until September and thereafter limited her to seated work, with the ability to get up every hour, with no bending, stooping, or squatting.  R. 315-17.  On September 3, Dr. Schaeffer wrote that "[t]here is no reason why she cannot work."  R. 314; *see also* R. 312.  He also concluded "[h]er subjective symptoms certainly are not substantiated from the objective orthopaedic examination."  R. 314. He recommended that Pilvelis continue exercises and use over-the-counter anti-inflammatory medication.  R. 309.

Pilvelis sought a second opinion from Royce E. Hood, Jr., M.D.  R. 350.  An MRI revealed that Pilvelis had a torn medial meniscus.  R. 346-47.  Dr. Hood recommended surgery and indicated that Pilvelis was unable to work.  R. 345-46.  He performed arthroscopic surgery on October 1, 1999.  R. 343. Thereafter, she was to avoid squatting and kneeling, but could bear weight as much as she could tolerate.  *Id*.  Dr. Hood indicated that Pilvelis could return to work with no climbing, bending, kneeling, prolonged standing or walking.  R. 341-42.  His diagnosis was chondromalacia[6] of the patella.  R. 342.  Shortly thereafter, Dr. Hood also prescribed use of a stabilizing brace and referred Pilvelis to physical therapy.  R. 338.

In November 1999, Dr. Hood indicated that Pilvelis should not sit for more than an hour without changing positions.  R. 334.  He also prescribed a cane.  R. 330.  Her condition improved

---

[6] Chondromalacia, also known as runners knee, "causes knee tenderness, knee pain in front of the knee, and a grating sensation in the knee. . . . It is treated with rest or immobilization and nonsteroidal anti-inflammatory drugs for pain. Physical therapy, especially quadriceps strengthening and hamstring stretching may also be helpful. Surgery is beneficial if there is a problem with the alignment of the patella that cannot be corrected with therapy."  Medline Plus, *Runners Knee*, http://www.nlm.nih.gov/medlineplus/ency/imagepages/9858.htm (last visited Mar. 19, 2007).

through December, but she still experienced weakness.  R. 329.  In April 2000, Dr. Hood

concluded that Pilvelis had reached maximum medical improvement. She was restricted from

repetitive squatting, kneeling, climbing, or bending.  R. 319.

In February 2000, Pilvelis was seen at an emergency room for back pain.  R. 286-89.  X-

rays revealed mild degenerative changes in the lumbar spine, and a compression deformity in the

thoracic spine. R. 287-88.

Records from Jeffrey T. O'Brien, M.D., from January 2001 to March 2001, indicate that

Pilvelis required additional surgery for "unspecified internal derangement of the knee," which was

conducted April 6, 2001.  R. 142-44; *see also* R. 145-58, 166-74 (surgical records).  The discharge

summary reflected a principal diagnosis of patellar maltracking, with a secondary diagnosis of an

ischemic[7] foot. R. 158.  Minimal degenerative arthosis within the patellofemoral joint was also

noted.  R. 152.

After the surgery, Pilvelis experienced "a lot of knee pain" that did not respond to

treatment, bluish discoloration of the foot, and problems with pulses in the foot.  R. 161.  An

arteriogram revealed a likely injury to the posterior tibial artery.  R. 158.  Asad R. Shamma, M.D.,

diagnosed ischemia of the foot, R. 396-97, and performed bypass surgery that improved but did

not normalize her condition, R. 161-65.  *See also* R. 392-93 (surgical records).  Postoperative

records indicate "persistent, severe, acute postoperative pain," for which Dr. O'Brien adjusted her

medications,  R. 159-60, 446, and limited her to light duty, R. 447.  She was also instructed to use

a cane.  R. 429, 444.

---

[7]  Ischemia refers to a lack of blood supply to a particular area, usually because of an
obstruction. STEDMAN'S at 894.

-12-

Records from Dr. O'Brien between April 2001 and March 2002, indicate that Pilvelis was seen for follow-up, evaluation of her progress through physical therapy, and continuing difficulty with her right knee, including popping and reduced range of motion.  The plan called for progressively aggressive physical therapy.  R. 143-44,176-86, 440.  *See also* R. 388-89 (consultation by Stephen Goldberg, M.D.).  Dr. O'Brien instructed her not to work from April 23 through July 2001.  R. 433-438.  By June 2001, Pilvelis reported "doing much better most of the time."  R. 436-37.  However, by September 2001, she was again instructed not to work through January 2002.  R. 417, 425, 433.[8]  In October 2001, she was prescribed a wheelchair for use due to patella maltracking.  R. 419, 430.

Records from Dr. Shamma between May 2001 and May 2002, indicate that Pilvelis continued to be monitored for circulatory problems after the surgical complications, particularly of the popliteal vein.  R. 199-209.  She experienced right calf discomfort with ambulation, and Dr. Shamma observed that she "will need to be monitored for life . . . because of the risk of intimal hyperplasia."[9]  R. 199.  She required physical therapy to increase the range of motion in both ankles.  R. 399-400.

In April 2002, Pilvelis was seen by Hany Helmy, M.D., for a second opinion at the request of her worker's compensation provider.  R. 194-97.  Pilvelis complained of right knee pain, hypersensitivity and problems walking.  She reported that she could not stand, walk, sit or sleep for any length of time without discomfort or pain in her right knee.  R. 194. Upon examination, Dr.

---

[8]  The record does not clearly indicate whether Dr. O'Brien released Pilvelis to return to work at any time between April 2001 and January 2002.

[9]  Intimal hyperplasia refers to a thickening of the blood vessels.  STEDMAN'S at 829, 885.

Helmy observed full range of motion and strength, and confirmed Pilvelis's complaints of hypersensitivity.  She was unable to lock her right knee when extended, resulting in problems walking.  Dr. Helmy noted that Pilvelis had chondromalacia of both knees, as well as a fixed flexion deformity of the right knee.  R. 196.  Dr. Helmy recommended physical therapy, pain management and psychological evaluation and treatment due to reactive depression.  R. 197.

Progress notes from Dr. Ahmed between February 2002 and January 2003, describe Pilvelis's history and indicate that she could not straighten her right leg, or sit or stand in one position, without significant pain.  R. 237-40.  She had crying spells and did not sleep well.  R. 239.  Dr. Ahmed's assessment was the Pilvelis had right knee deformity with possible RSD and depression.  Dr. Ahmed treated her with medication.  R. 237-38.

In November 2002, Pilvelis was seen by Dr. John Spencer C. Archinihu at the request of SSA.  R. 210-13.  She had a limping gait but ambulated well without any assistive device.  R. 212.  Upon examination, Dr. Archinihu noted that Pilvelis had atrophy of the right lower leg with weakness.  She had limitation in the ability to flex her right knee.  She had good hand manipulation and full grip strength.  Dr. Archinihu's impression was right leg Reflex Sympathetic Dystrophy.  *Id.*

Dr. Archinihu opined that Pilvelis could do sedentary work with limitations.  She could stand and walk for no more than two hours in an eight-hour day, but she could sit for six hours with regular breaks.  She should avoid kneeling or crouching because of stress on her knees.  She was restricted to lifting and carrying five pounds occasionally and two pounds frequently.  She had no restriction on grasping or fingering, and no environmental limitations.  *Id.*

In February 2003, Tom Winters, M.D., evaluated Pilvelis and observed that she had limited range of motion following her surgeries.  He recommended physical therapy.  He concluded, "I would allow her back to work to a sit-down position only.  She reports that she cannot sit or stand for long periods of time and I told her that possibly getting up and moving around for 5-10 minutes every 1-2 hours would be a consideration.  I would recommend she be active and thus could be back at a work duty status."  R. 450.

In May 2003, Pilvelis was seen by Richard C. Smith, who performed an independent medical examination.  R. 451-57.  Her knee pain was constant, with popping, clicking, and giving out, and she had difficulty bending and straightening her leg.  R. 452.  She had an antalgic gait.  R. 454.  She had frequent headaches, joint swelling, depression, and insomnia.  R. 452-53.  His assessment was internal derangement of the right knee with radiculopathy.  R. 457.  Dr. Smith observed that Pilvelis had reached maximum medical improvement with a 29% impairment rating and recommended that she be on no-work status.  R. 454.  He also recommended a psychiatric evaluation and referral to a specialist in RSD.  *Id.*

In July 2004, Pilvelis was seen by Anthony Kirkpatrick, M.D.  R. 458-61.  Dr. Kirkpatrick indicated that Pilvelis had a history of Crohn's disease, which was controlled, and that while she had depression, it was stable at that time.  R. 459.  She complained of constant pain that was "throbbing, shooting, stabbing, burning and aching in nature."  R. 458.  She ambulated with a severe antalgic gait, had some swelling around the knee, and had scars from the prior surgeries.  R. 459.  The assessment was RSD of the right lower extremity, which was severe and untreated, and chronic pain syndrome complicated by depression.  R. 460.  Dr. Kirkpatrick observed that

-15-

"[a]lthough [Pilvelis] is willing to try sedentary work on a full-time basis, in my opinion, I do not believe [she] is capable of full-time work at this time; however, a trial of part-time work as sedentary work might be worthwhile.  I do not recommend prolonged bending or squatting under any circumstances."  R. 460.

Pilvelis underwent gallbladder surgery in July 2004 after experiencing epigastric pain.  R. 59; 463-74.

In September 2004, Pilvelis was seen by Marc. R. Gerber, M.D., for continuing pain.  R. 504-06.  She had a mildly antalgic gait, did not use an assistive device, and had limited ability to ambulate long distances.  R. 504.  She was unable to extend her right knee fully.  *Id*.  She experienced hypersensitivity, including pain associated with light touch, consistent with allodynia, and a burning sensation consistent with hyperpathia.[10]  R. 504-05.  She was unable to tolerate examination.  R. 504.  These symptoms were consistent with complex regional pain syndrome, which Dr. Gerber indicated replaced the old terminology of RSD.  R. 505.  He prescribed medication and indicated that Pilvelis was unable to work at that time.  R. 506.

In October 2004, Pilvelis was seen by Thomas J. Brodrick, M.D., for complaints of wrist pain, difficulty grasping, and inability to make a tight grip.  R. 476.  The impression was mild bilateral carpal tunnel syndrome, which was confirmed by an EMG (electromyography).  R. 476-78.  Dr. Brodrick advised that "surgery is not mandatory since the EMG studies reveal that it is mild."  R. 477.

---

[10]  Allodynia refers to a "[c]ondition in which ordinarily nonpainful stimuli evoke pain."  STEDMAN'S at 50.  Hyperpathia refers to "[e]xaggerated subjective response to painful stimuli, with a continuing sensation of pain after the stimulation has ceased."  *Id*. at 828.

In November 2004, Dr. Gerber observed that Pilvelis continued to have a mildly antalgic gait and did not use an assistive device.  R. 500.  He encouraged her to return to work with the following limitations:  "[A]void heavy lifting and bending over 10 pounds and . . .prolonged walking or standing.  She may need to change positions [as needed] during the day."  R. 500-01. He adjusted her medications, R. 500, and advised an exercise program with aquatics, R. 493.

At a follow-up with Dr. Gerber in February 2005, Pilvelis expressed frustration with physical therapy and other issues.  R. 489.  Dr. Gerber indicated that he believed she had symptoms of depression and started an antidepressant.  *Id*.  In June 2005, Dr. Gerber prescribed a wheelchair for long distances.  R. 509.

Also in June 2005, Dr. Gerber completed a Physical Residual Functional Capacity Questionnaire.  R. 507-08.  He indicated that Pilvelis could sit up to one hour at a time, stand up to fifteen minutes at a time, stand/walk for less than two hours in an eight-hour workday, and sit for at least six hours in an eight-hour workday.  R. 507.  She would also need to take one or two unscheduled breaks of five to ten minutes each workday.  *Id*.  She could rarely lift twenty pounds, occasionally lift ten pounds, and frequently lift less than ten pounds.  *Id*.  He indicated that Pilvelis would have good days and bad days.  R. 508.  Dr. Gerber estimated that, on average, Pilvelis likely would be absent from work two or three days per month because of her impairments or treatment. *Id*.

2.    Records Regarding Mental Impairments.

In May 1999, Pilvelis saw Robert E. Harper ARNP (Advanced Registered Nurse Practitioner) because of stress at work and home.  R. 365.  She requested mental health counseling. *Id*.

In May 2003, Pilvelis was seen by Darlene Beers, Psy.D., a resident under the direction of Rosimeri Pereira Clements, Psy.D., a licensed psychologist.  R. 249-51.  Dr. Beers indicated that Pilvelis drove herself to the appointment, was appropriate dressed and groomed, had no prominent gait abnormalities, gross motor coordination problems, or fine motor shakes or tremors, although she stood up often to move her legs.  R. 250.  She had no symptoms of psychosis and showed good memory and recall.  *Id*.  Speech and thought processes were logical and coherent.  *Id*.  She did not appear in acute mental distress, but was tearful throughout the evaluation.  *Id*.  Dr. Beers's assessment was adjustment disorder with depressed mood with a GAF score 56.[11] *Id*.

In June 2005, in response to a letter from Pilvelis's attorney, Dr. Gerber wrote that it was medically necessary for her to be evaluated by a psychiatrist.  R. 15.

---

[11]  The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. A GAF rating between 51 and 60 reflects:

> Moderate symptoms (eg, flat effect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998).

    *D.    Reviewing Professionals.*

       1.    <u>Records Regarding Physical Impairments</u>.

In December 2002, an unidentified person prepared a Physical Residual Functional Capacity Assessment, the copy of which is incomplete in the record. R. 232-35. The reviewer indicated that Pilvelis could occasionally lift up to ten pounds and frequently lift less than ten pounds, could stand or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. R. 233. She was restricted to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. R. 234. She had no manipulative, visual, communicative, or environmental limitations. R. 235-36.

In February 2003, Ronald S. Kline, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 241-48. Dr. Kline concluded that Pilvelis could occasionally lift up to ten pounds and frequently lift less than ten pounds; could stand or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. R. 242. He also concluded that she would be limited in the ability to push or pull with her lower extremities because of weakness and pain. *Id*. Dr. Kline concluded that Pilvelis could occasionally balance, stoop, and crouch. R. 243. She could occasionally climb a ramp or stairs, but never a ladder, rope, or scaffolds. *Id*. She also could never kneel or crawl. *Id*. She had no manipulative, visual, communicative, or environmental limitations. R. 244-45. He concluded that her allegations of pain were probably credible, and that she appeared capable of sedentary work. R. 246.

2.      Records Regarding Mental Impairments.

In December 2002, Jeffrey L. Prickett, Psy.D., prepared a Psychiatric Review Technique form.  R. 215-31.  He found no medically determinable impairments.  R. 215.

In May 2003, Nancy Dinwoodie, M.D., prepared a Psychiatric Review Technique form.  R. 252-65.  Dr. Dinwoodie concluded that Pilvelis had an adjustment disorder but that it was not severe.  R. 252, 255.  She concluded that Pilvelis would experience mild restrictions on activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. R. 262.

## IV.   STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

-21-

1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Pilvelis raises a number of interrelated arguments regarding her ability to return to her past relevant work.  She first contends that the ALJ failed to discuss Dr. Gerber's expectation that she would miss two or three days of work per month. The Commissioner contends that "[t]he VE never testified that Plaintiff could not maintain employment if she missed 2-3 days of work per month."  Doc. No. 15 at 8.  As quoted above, the VE's testimony can fairly be understood to be that if a claimant regularly missed work two to three days of month, the claimant would not be able to hold a job.  The VE was clear that if a claimant regularly missed three days of work a month, she would be unable to work.

The Commissioner must evaluate a claimant's ability to hold a job, as well as to perform the work requirements of a job.  The relevant regulations require the Commissioner to assess whether a claimant can perform work on a "regular and continuing basis."  20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c).  Courts have held "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time."  *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *accord Wallace v. Barnhart*, 256 F. Supp. 2d 1360, 1375-77 (S.D. Fla. 2003)(collecting cases).  Therefore, even if the VE's assessment was only that Pilvelis

-23-

would not likely to be able to hold a job if she missed two to three days of work a month, that assessment would be relevant to the determination whether Pilvelis could return to her past relevant work or perform other available work.

Moreover, and most importantly, the ALJ failed to articulate the reasons that she did not adopt the portion of Dr. Gerber's RFC assessment addressing Pilvelis's likely absences from work. In this circuit, an ALJ is required to articulate specific reasons for failing to give considerable weight to the opinion of a treating physician, such as Dr. Gerber. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). I cannot discern from the ALJ's decision the reason she did not adopt all of the Dr. Gerber's physical RFC assessment. Because the limitations on Pilvelis's ability to work on a regular and consistent basis, as indicated by Dr. Gerber, would be relevant to her ability to perform her past relevant work, as indicated by the VE, it was incumbent on the ALJ to articulate the reason that she concluded that Pilvelis would not have attendance problems as indicated by Dr. Gerber.

Pilvelis urges the Court to reverse the decision of the Commissioner and remand for an award of benefits. An award of benefits is appropriate only when the Commissioner has considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). In the present case, it is not clear that the cumulative effect of the evidence establishes disability without any doubt. Rather, the record is inadequate with respect to the basis for the ALJ's decision. If, on remand, the ALJ articulates specific and adequate reasons for rejecting Dr. Gerber's assessment regarding the number of days of work Pilvelis might miss in a month, or

clarifies with the VE that even if Dr. Gerber's assessment were accepted, it would not preclude

Pilvelis from holding jobs available in the national economy, then an award of benefits would not

be required.  Accordingly, remand for further proceedings is the appropriate remedy.

Because I conclude that remand is required for the reasons discussed herein, I will not

address the remaining arguments raised by Pilvelis.  I note, however, that on remand Pilvelis may

submit additional medical evidence regarding her mental impairments and the functional

limitations arising from carpal tunnel syndrome, if such evidence exists.  She may also request that

the Commissioner order a consultative psychological or psychiatric evaluation if she can establish

that such an evaluation is necessary to fill gaps that may exist in the record.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is

**REVERSED** and the case is **REMANDED** for further proceedings.  The Clerk of Court is

directed to enter a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 19, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-25-